**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-3400-CNS-TPO

ROBERT ANDREWS,

                Plaintiff,

        v.

SEAN F. SOON,

                Defendant.

---

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiff Robert Andrews ("Plaintiff"), by and through his attorneys, HKM Employment Attorneys LLP, for his Second Amended Complaint and Jury Demand against Sean F. Soon ("Soon" or "Defendant"), states and alleges as follows:

**PRELIMINARY STATEMENT**

1.    This case arises from Defendant Sean Soon's discrimination against Plaintiff based on Plaintiff's race and/or color (Black) in violation of 42 U.S.C. § 1981 ("Section 1981"), as well as Defendant's defamation against Plaintiff.

2.    Plaintiff, a Black man, dedicated nearly eight years of service to CommunityWorks, eventually was promoted to the role of President and CEO in 2018. Under Plaintiff's leadership, the organization experienced unprecedented growth, expanding its funding from $250,000.00 at the start of 2022, to over $6 million by the year's end.

3.      In 2023, CommunityWorks experienced an unexpected change to its grant funding that was entirely outside of Plaintiff's control. The change resulted in a temporary loss of approximately $1 million, but Plaintiff worked to implement a strategic recovery plan. A central part of this plan involved subleasing three grants and associated operations to Anchor Academy, a nonprofit run by CommunityWorks' then-COO, Juaquin Mobley, who is also Black. This sublease was a lawful, common practice for CommunityWorks, and it was fully discussed with and explained to CommunityWorks' Board of Directors, who gave their approval for Plaintiff to finalize the agreement. Despite this transparency, less than two months later, the Board abruptly terminated Plaintiff without warning, accusing him—falsely—of making unauthorized decisions, compromising the organization's sustainability, and creating unapproved financial partnerships.

4.      Almost immediately after Plaintiff's termination, Board member and attorney Defendant Sean Soon, who had been with CommunityWorks for about a year, assumed the role of President and CEO. Soon was also the driving force behind Plaintiff's termination, yet he did not pursue the removal of Plaintiff's white colleague, Vice President of Finance Nathan Kimbro, who had been equally involved in the decision to sublease the grants.

5.      Following his takeover, Soon launched a racially charged smear campaign against Plaintiff and other Black former employees, referring to them as "thugs" and "thieves," and stating that CommunityWorks would not hire any more employees like "them."

6.      In an April 2024 letter to the sponsor of one of the subleased grants, Soon falsely accused Plaintiff and Mobley of theft, fraud, and secretly dividing company property for personal gain—claims he knew to be untrue. Soon also fabricated a Board confrontation that never happened and omitted any mention of Kimbro's role in the plan to sublease the grants, targeting only the Black employees.

7.      Soon's defamatory narrative quickly spread throughout the Colorado nonprofit community, harming Plaintiff's reputation, employability, and ability to secure grant funding for a new nonprofit venture. Even after a review of CommunityWorks' accounts revealed no evidence of theft or embezzlement, Soon continued to repeat the accusations. He admitted his actions were intentional, expressed satisfaction that they were damaging Plaintiff's career, and stated he would only stop if CommunityWorks received certain grant awards, at which point he claimed he would "write [Plaintiff] a letter of recommendation."

8.      Soon continued to make false and damaging statements about Plaintiff long after coercing Plaintiff's discriminatory termination, and Plaintiff continued to discover both new and repeated defamatory statements made by Soon for more than a year after Plaintiff's discriminatory termination from CommunityWorks. For example, in addition to continuing to spread salacious and untrue rumors about the circumstances of Plaintiff's termination, Soon fabricated additional stories concerning Plaintiff's marriage and a made-up "indictment" that had supposedly resulted in a lien being placed on Plaintiff's home that were spread to individuals within Plaintiff's personal and professional circles, including supporters of Plaintiff's campaign for Aurora City Council.

3

9.      Soon's starkly different treatment between Plaintiff, a Black executive, and Kimbro, a white executive equally involved in the same decision-making—combined with Soon's racially charged language and fabricated allegations—shows that Plaintiff's termination and the subsequent campaign to destroy his reputation were motivated by Plaintiff's race and/or color. Plaintiff's career, built over years of service and success, was derailed by a calculated scheme that weaponized falsehoods and racial bias to remove him from leadership, install Soon in his place, and damage his standing in the nonprofit sector.

## PARTIES

10.      Plaintiff is and was, at all times relevant to this Complaint, domiciled in Colorado.

11.      Upon information and belief, Defendant Sean Soon is and was, at all times relevant to this Complaint, an individual domiciled in Colorado.

12.      Upon information and belief, Defendant Sean Soon operates a law practice located at: 6000 East Evans Avenue, Building 2, Suite #225, Denver, CO 80222, which is located in Denver County.

## JURISDICTION AND VENUE

13.      Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

14.      This Court has jurisdiction over Defendant, because Defendant currently conducts and, at all times relevant to this Complaint, conducted substantial business activities in Denver County, Colorado.

4

15.     Venue is proper pursuant to C.R.C.P. 98(c)(5), because the alleged commission of unlawful acts occurred in Denver County, Colorado.

### **FACTUAL ALLEGATIONS**

16.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

17.     Plaintiff is Black.

18.     Plaintiff began working for CommunityWorks on or about July 5, 2016. In or around May 2018, Plaintiff was promoted to the Company's President and Chief Executive Officer ("CEO").

19.     Plaintiff at all times met or exceeded the Company's legitimate performance expectations.

20.     During Plaintiff's employment with CommunityWorks, Defendant Sean Soon operated his law practice out of the same building where CommunityWorks' office was located.

21.     In or around early 2023, Soon joined the Board of Directors for CommunityWorks.

22.     On or about December 26, 2024—approximately nine months after Plaintiff was terminated—CommunityWorks was dissolved, and it is no longer in operation.

23.     While it was in operation, CommunityWorks provided job training and placement opportunities for people in need of work in communities around the Colorado front range.

24.     The Company was funded in large part by grants from various sources, such as the U.S. Department of Labor and other governmental agencies and nonprofit groups.

25.     The Company operated by entering into agreements for services with other organizations within the communities CommunityWorks served in order to provide training, resources, and other materials for people who utilized CommunityWorks' services.

26.     In Plaintiff's role as President and CEO, he was responsible for, *inter alia*, executive decision-making and oversight regarding the contracts CommunityWorks entered into, including memorandums of understand ("MOUs"), as well as managing the Company's budget and funding based on grants they received.

27.     Throughout 2022, Plaintiff led CommunityWorks through a period of unprecedented growth in funding. CommunityWorks started the year with only $250,000.00 in funding and ended 2022 with more than $6 million in funding, due to efforts led by Plaintiff.

28.     Unfortunately, in 2023, one of the largest grants CommunityWorks had received suddenly changed in terms of both the size of the grant being provided and the way it was paid to CommunityWorks.

29.     These changes to the grant were attributable to the grantor and were entirely outside of Plaintiff's control.

30. However, by the time CommunityWorks learned of the changes to the grant, the Company had already built its 2023 financial projections and billing practices around the way the grant was originally written.

31. As a result, when the terms of the grant suddenly changed, CommunityWorks was forced to spend money at a higher rate than what the grant was returning to the Company.

32. This change in grant funding led CommunityWorks to report a loss of approximately $1 million in 2023.

33. Nonetheless, Plaintiff worked incredibly hard throughout the remainder of 2023 to make up for the loss.

34. By the end of 2023, CommunityWorks was on track to receive more than $8 million in funding for 2024, far more than making up for the loss the Company had experienced.

35. As a result of the loss generated by the change in grant funding, Plaintiff and the Company's Vice President of Finance, Nathan Kimbro ("Kimbro"), identified ways to mitigate the financial fallout.

36. The path Plaintiff and Kimbro identified was to act as the fiscal sponsor of the grant to sublease it out to another nonprofit CommunityWorks worked with. Acting as the grant's fiscal sponsor would allow CommunityWorks to retain 10% of the grant funds, while enabling another nonprofit to use the grant money in a profitable way to run CommunityWorks' existing services in Colorado Springs, Colorado.

37.    In other words, the plan devised by Plaintiff and Kimbro resulted in a net positive result for both nonprofits.

38.    Furthermore, this was not the first time CommunityWorks had subleased a grant.

39.    It was within the normal course of business for Plaintiff to enter into sublease agreements of this nature with other nonprofits.

40.    More specifically, Plaintiff and Kimbro decided to sublease three grants: WAGES, FHI GO, and Transforming Safety.

41.    Those three grants had been previously used to fund WHealthy Unlimited LLC ("WHealthy"), one of CommunityWorks' programs in Colorado Springs.

42.    Along with the grant funding, operation of the WHealthy program and all associated assets, including CommunityWorks' Colorado Springs office space, would also be subleased through an MOU to Community Anchor Academy Incorporated ("Anchor Academy").

43.    Anchor Academy is a nonprofit owned and operated by Juaquin Mobley ("Mobley").

44.    Mobley is Black.

45.    At the time Plaintiff and Kimbro were evaluating subleasing the grants, Mobley was also serving as CommunityWorks' Chief Operating Officer ("COO").

46.    Mobley was therefore apprised of CommunityWorks' mission and the purpose behind the grants it had received.

47.    Mobley met all the qualifications to assume responsibility for the grants.

8

48. Mobley also had the support of the original grantors of the WAGES, FHI GO, and Transforming Safety grants to move forward with operation of WHealthy.

49. The plan created by Plaintiff and Kimbro was for the Anchor Academy MOU (referred to hereinafter as the "MOU") to stay in place until the grants ended on or about July 1, 2024, at which point Anchor Academy would enter into negotiations to fully purchase WHealthy from CommunityWorks.

50. To that end, on or about January 10, 2024, Plaintiff and Kimbro laid out the subleasing plan to CommunityWorks' Board of Directors (the "Board").

51. Approximately nine Board members were present, including Defendant Sean Soon and the Board Chair, Monica Badgett.

52. Plaintiff did not need the Board's approval in order to sign the MOU, as it was within the purview of the President's role to sign contracts of this nature on behalf of CommunityWorks.

53. However, Plaintiff wanted to explain the strategic vision behind the plan, so the Board was apprised of how he was working to right CommunityWorks' finances.

54. Prior to the meeting, Kimbro sent an impact report evaluating the sublease agreement to give the Board a full picture of the transition that would take place.

55. At the start of the meeting, Plaintiff and Kimbro explained to the Board that WHealthy would be split off from CommunityWorks entirely.

56. They further explained that moving forward, WHealthy would be managed by Anchor Academy and Mobley.

57.    Plaintiff explained that Mobley would resign from his position as a COO in order to fully separate WHealthy from association with CommunityWorks.

58.    Mobley's resignation would ensure there was no conflict of interest between the two companies once the MOU went into place.

59.    Plaintiff, Mobley, Kimbro, and the Board discussed the transition plan and impact report in detail, including specific funding from grantors that had already been promised to support the transition and how those funds would be distributed.

60.    Mobley offered to set up a conversation between the grantors and the Board.

61.    The Board declined, stating that the exact details of funding for the transition were more aligned with the "operational side" of the organization that the Board did not need to be involved with.

62.    After talking through how the transition would be messaged publicly, the Board simply requested that Plaintiff and Mobley finalize the agreement and email the final copy to the Board.

63.    At no point did the Board express disagreement with the overall plan or a misunderstanding of the direction in which Plaintiff had decided to take the grants or the sublease.

64.    The following day, having ironed out the final details, Plaintiff signed the MOU with Mobley. The agreement had an effective date of February 1, 2024.

65.    A couple weeks later, on or about February 18, 2024, the Board Chair, Monica Badgett ("Badgett"), reached out to Plaintiff to ask some clarifying questions regarding the MOU.

66.    In response, Plaintiff explained again that, per the impact report, the plan was to sublease the three grants in Colorado Springs to WHealthy, along with the Colorado Springs office space.

67.    Plaintiff further requested to meet with Badgett to discuss the transition further, but Badgett declined to meet with him.

68.    On or about February 21, 2024, Plaintiff reached out to Badgett again to request a to speak with her about the WHealthy transition prior to the February Board meeting, which was scheduled for the same day.

69.    Plaintiff further requested to push the meeting back by a week in order to give the two of them time to talk, and Badgett agreed to move the meeting.

70.    However, when Plaintiff reached out to attempt to schedule the meeting that week, Badgett never responded.

71.    At the Board meeting on or about February 28, 2024, the Board again discussed Anchor Academy's assumption of the grants and lease for WHealthy.

72.    Based on the agreement that had been signed, the Board conferred in more detail on how expenses would be shared between Anchor Academy and CommunityWorks throughout the time CommunityWorks' grants were active, and they identified how costs related to the transition were reflected on CommunityWorks' 2024 financial forecasts.

11

73.    Plaintiff further explained that he had already asked an attorney to review the agreement and had ensured the agreement was written to accomplish CommunityWorks' goals with respect to subleasing the grants.

74.    After asking some detailed questions about CommunityWorks' 2024 financial projections, which included projections for the fiscal sponsorship of the grants to Anchor Academy, the Board confirmed it planned to review and sign onto a letter regarding the transition.

75.    The Board did not express disagreement with the subleasing plan or any confusion as to what the plan entailed.

76.     On or about March 10, 2024, Plaintiff once again contacted Badgett to attempt to schedule a meeting to discuss the WHealthy sublease and transition.

77.    In response, Badgett claimed she would call Plaintiff when she got home later that day, but never did so.

78.    Plaintiff followed up again on March 13, 2024, asking Badgett to call him, but she did not do so.

79.    On March 19, 2024, Plaintiff received a letter from the Board stating he was being terminated.

80.    Plaintiff was completely blindsided by the termination letter, as he had been given no warning that his termination was even being considered by the Board, much less that it had already been approved.

81.    The Board claimed the grounds for Plaintiff's termination were that Plaintiff had purportedly engaged in "organizational decisions made without the approval of the

[B]oard, compromising the sustainability of the organization, and creating unapproved financial partnerships with entities that endanger the health of Community Works."

82.    Furthermore, the letter explained that CommunityWorks would enter "board receivership," meaning all decisions on behalf of CommunityWorks would be made by the Board of Directors for the foreseeable future.

83.    Plaintiff sought input from the Board on all major decisions he made on behalf of CommunityWorks.

84.    Plaintiff did not create unapproved financial partnerships with entities that endangered the health of CommunityWorks.

85.    During Plaintiff's employment with CommunityWorks, Plaintiff received exclusively positive performance evaluations.

86.    The financial downturn CommunityWorks experienced in 2023 was not the reason for Plaintiff's termination; and CommunityWorks has never claimed to Plaintiff that the financial downturn from 2023 was part of the reason that it decided to terminate Plaintiff.

87.    Almost immediately following Plaintiff's termination, Soon took over as the President and CEO of CommunityWorks.

88.    At the time of Plaintiff's termination, Soon had only been working with CommunityWorks for approximately one year.

89.    Upon information and belief, Soon is not, and does not identify as, Black.

90.    Upon information and belief, Soon held the opinion that Plaintiff should be terminated at the time of CommunityWorks' termination of Plaintiff.

13

91.     Upon information and belief, Soon held the opinion that Plaintiff should be terminated prior to CommunityWorks' termination of Plaintiff.

92.     Upon information and belief, Soon voiced his opinion to other Board members that Plaintiff should be terminated prior to CommunityWorks' termination of Plaintiff.

93.     Although Kimbro was equally involved in the decision to commit to the MOU with Anchor Academy, Soon did not likewise attempt to aid, assist, incite, compel or coerce the Board in taking any adverse action against Kimbro.

94.     Upon information and belief, Kimbro is not, and does not identify as, Black.

95.     Upon information and belief, Kimbro is white.

96.     After assuming the role of President and CEO at CommunityWorks, Soon began to make statements highlighting his discriminatory animus toward Plaintiff on the basis of Plaintiff's race and/or color.

97.     For example, during discussions around hiring on new employees, Soon stated that CommunityWorks would not hire any more "thugs or thieves like them," in reference to Plaintiff, Mobley, and another former Black employee.

98.     "Thug" and "thief" are offensive, racially charged terms, given the ways that they have historically and stereotypically been applied to Black people.

99.     Soon also began to publicly spread false, racially charged information about Plaintiff to the broader Colorado nonprofit community.

14

100.   In an April 10, 2024 letter to the National Institute for Work and Learning, the sponsor of the FHI GO grant, which Soon wrote on behalf of CommunityWorks, Soon repeatedly accused Plaintiff of committing "theft."

101.   Soon painted a fabricated narrative around the MOU being a fraudulent agreement entered into between Mobley and Plaintiff, which Soon falsely claimed had been executed without the Board's knowledge.

102.   To lend credibility to his fiction, Soon further informed the grantors that he is an attorney.

103.   Soon also falsely claimed he had been working with CommunityWorks for over 5 years at that point, when he had actually been working with CommunityWorks for barely more than one year.

104.   In detail, Soon crafted his story about CommunityWorks' Black former employees, stating:

> Upon review of the evidence, Mobley, our Vice President, and [Plaintiff], our President and CEO, decided to divide this company, including property, grants and funds, amongst themselves. While still employees of [CommunityWorks], they secretly signed a MOU on January 31, 2024, and directed staff to divide the company. Specifically, the staff of Aurora and Colorado Springs were told to cease all work on these grants. At some point, Mobley then removed all of the administrators to the federal databases, such as the ETO and Sharepoint systems, and changed all the passwords. This effectively locked the [CommunityWorks] staff out of the databases necessary to service these grants.

105.   Soon continued, falsely claiming CommunityWorks was pursuing legal action against Plaintiff and Mobley, stating:

> From a legal standpoint, Mobley and [Plaintiff] have committed theft. Employees do not own a Corporation. When you intentionally take money and property of another, with the intent of depriving them permanently of its

15

use, you have committed theft. There are legal proceedings concerning all individuals who have seized, stolen, converted, transferred and otherwise exercise control over property and funds that do not belong to them.

106.    Soon further fabricated a supposed encounter between Mobley and the Board that Soon claimed took place when Plaintiff and Mobley presented the MOU to the Board, in which Soon claimed Mobley had been "ordered to return the money and property [he and Plaintiff] had converted and were informed that any 'side deals' between them were illegal and nonbinding."

107.    This exchange never occurred.

108.    Although Kimbro, a white employee, had also been involved in the crafting of the MOU and the strategic financial plan to sublease WHealthy to Anchor Academy, Kimbro was not mentioned a single time as part of Soon's false narrative accusing Black employees of misconduct.

109.    In other words, not only was Soon's narrative untrue, but it was also racially motivated, painting Black employees—and only Black employees—as thugs and thieves, in line with offensive racial stereotypes.

110.    Soon further claimed his allegations about Plaintiff and other Black employees were based on "a review of the evidence."

111.    However, there is no evidence supporting Soon's claims.

112.    Plaintiff did not engage in any of the misconduct described by Soon.

113.    After sending the untrue and defamatory letter, Soon admitted that he had conducted a full review of CommunityWorks' accounts and found no evidence of any theft or embezzlement by Plaintiff or Mobley.

114.    Soon was present for at least one Board meeting at which the MOU was discussed by Plaintiff and/or Mobley.

115.    Soon knew the claims he made about Plaintiff were untrue at the time he sent the letter to the National Institute for Work and Learning.

116.    Despite Soon's knowledge that the accusations he had levied against Plaintiff were untrue, he continued to perpetuate them within the Colorado nonprofit community.

117.    For example, in approximately late December 2024 or early January 2025, Plaintiff learned that Soon had repeated the false allegations concerning the reasons for Plaintiff's termination from CommunityWorks—i.e., that Plaintiff was a "thief" that had stolen from the organization—to Rebecca Balu at the Colorado Department of Human Services – Employment First Division, a governmental organization that partnered with CommunityWorks.

118.    In approximately November 2025, Plaintiff learned that Soon had also repeated the same allegations concerning the reasons for Plaintiff's termination to additional employees of the National Institute for Work and Learning ("NIWL") beyond the original recipients of Soon's April 2024 letter. Plaintiff only learned that Soon had shared the allegations with additional employees of the NIWL after an employee left the organization and shared externally their knowledge of the false allegations they had heard from Soon concerning the reasons for Plaintiff's termination from CommunityWorks.

119.    In approximately January 2025, Plaintiff learned that Soon had told Cedric Pride—Plaintiff's friend and a previous campaign supporter—that Plaintiff had engaged

17

in an extramarital affair and that it had contributed to the decision to terminate Plaintiff from CommunityWorks. Pride was a contractor with CommunityWorks while Plaintiff worked there and continued interacting with Soon following Plaintiff's wrongful termination.

120.    After Plaintiff learned that Soon had spread this false and damaging rumor to Pride, the same false allegations concerning infidelity later came up in the course of Plaintiff's campaign for Aurora City Council, demonstrating the harm caused to Plaintiff's public reputation as a result of Soon's harmful smear campaign against Plaintiff.

121.    In approximately January or February 2025, Plaintiff learned from Joshua Jackson, the current or former Criminal Justice Chair of the Colorado NAACP, that Soon had been falsely telling others in the Colorado legal and nonprofit community that Plaintiff had been "indicted" associated with Soon's false allegations that Plaintiff had stolen from CommunityWorks. Plaintiff has not been indicted on any criminal charge associated with his termination from CommunityWorks.

122.    In approximately January or February 2025, Plaintiff learned that Soon had told Kimbro that he had placed a lien on Plaintiff's house associated with Soon's allegations that Plaintiff had stolen from CommunityWorks. No such lien has been placed on Plaintiff's home.

123.    On or about December 15, 2025, Plaintiff learned that while CommunityWorks was still in operation, Soon repeatedly claimed to Asya Stiles, CommunityWorks' Chief of Staff, that Plaintiff had supposedly only hired Mobley in order

to have Mobley's assistance in "lining [Plaintiff's] pockets" by stealing from CommunityWorks so that Plaintiff could run for Aurora City Council.

124.　Mobley was hired because of his background running programs and because he had an excellent reputation in the community among nonprofit grantors and partners. Furthermore, Mobley was hired in 2017, and Plaintiff did not run for office until 2023.

125.　Soon's false implication that Mobley was hired to assist in nonexistent criminal conduct constitutes additional evidence of his discriminatory animus toward Mobley and Plaintiff, both of whom are Black. Soon's false and damaging statements about Plaintiff and the claimed reasons for his termination from CommunityWorks spread quickly—and continue to spread—among the nonprofit community and beyond.

126.　Upon information and belief, based on Soon's false and damaging statements about Plaintiff, members of the statewide nonprofit community believe Plaintiff was terminated from CommunityWorks for theft and malfeasance.

127.　Upon information and belief, Soon's false and damaging statements negatively impacted Plaintiff's ability to obtain new employment following CommunityWorks' termination of his employment.

128.　Upon information and belief, Soon's false and damaging statements negatively impacted Plaintiff's ability to obtain grant funding for another nonprofit Plaintiff started following CommunityWorks' termination of his employment.

129.　At the time of Plaintiff's termination, Plaintiff had worked to build some level of name recognition within the Colorado nonprofit community.

130.    As a result, Soon saw the reputational damage to Plaintiff as a benefit to himself through his position with CommunityWorks.

131.    Soon personally benefited from his knowingly false statements about Plaintiff because harming Plaintiff's reputation in the Colorado nonprofit community would take Plaintiff out as competition for Soon, given that Plaintiff's termination would otherwise have resulted only in Plaintiff going to work for another nonprofit employer or venture, competing for the same opportunities that Soon and CommunityWorks sought.

132.    Soon stated that he would continue making defamatory statements about Plaintiff unless and until CommunityWorks received grants it had applied for.

133.    Soon then admitted that if CommunityWorks was successful in receiving the grants he sought, he would "write a letter of recommendation" for Plaintiff.

134.    Upon information and belief, Soon continues to make untrue and harmful statements about Plaintiff, knowing they are untrue or with reckless disregard for the truth.

## FIRST CLAIM FOR RELIEF

**Discrimination Based on Race and/or Color in Violation of the Civil Rights Act of 1866
42 U.S.C. § 1981 ("Section 1981")**

135.    Plaintiff incorporates by reference the above paragraphs of this Complaint as though set forth fully and separately herein.

136.    42 U.S.C. § 1981 prohibits discrimination in the making and enforcement of contracts and is designed to include a remedy against discrimination in employment on the basis of race and/or color.

20

137.    Under Section 1981, all persons have the same right to make and enforce contracts and to enjoy the full and equal benefit of all laws.

138.    Employment contracts are among those contracts protected by Section 1981.

139.    In or around May 2016, Plaintiff entered into a contract with CommunityWorks that is subject to Section 1981.

140.    Individual employees may also be individually liable under Section 1981 if the individual was personally involved in the discriminatory conduct. *See, e.g., Flores v. City and Cnty. of Denver*, 30 Fed. Appx. 816, 819 (10th Cir. 2002) ("[A]n individual employee can be held liable under § 1981 if there is an underlying employment contract and the individual employee was personally involved in the alleged racial discrimination.").

141.    Plaintiff is a member of protected classes based on his race and color, because he is Black.

142.    Defendant Soon treated Plaintiff differently; terminated and/or aided, abetted, incited, compelled, and/or coerced the termination of Plaintiff's employment based on allegations Defendant knew were false and which demonstrated Defendant's discriminatory animus against Plaintiff; and further denied Plaintiff full and equal benefit of all laws based on his race and/or color, unlike similarly situated employees outside of Plaintiff's protected classes.

143.    Based on the above-described acts, practices, and omissions, Defendant engaged in unlawful discrimination under Section 1981 based on Plaintiff's race and/or color.

144. Defendant's disparate treatment toward Plaintiff that was aimed at Plaintiff because of his race and/or color resulted in adverse impacts to the terms and conditions of Plaintiff's employment, up to and including Plaintiff's termination.

145. As such, Defendant violated 42 U.S.C. § 1981 and discriminated against Plaintiff by subjecting Plaintiff to less favorable terms and conditions of employment compared to employees not a part of Plaintiff's protected class; subjecting Plaintiff to degrading comments and conduct based on Plaintiff's race and color; and ultimately terminating and/or aiding, abetting, inciting, compelling or coercing the discriminatory termination of Plaintiff's employment.

146. The reasons Defendant submits for subjecting Plaintiff to disparate terms and conditions of employment and terminating Plaintiff, if any, are false and pretext for unlawful discrimination.

147. In unlawfully discriminating and retaliating against Plaintiff, Defendant acted intentionally or in the face of a perceived risk that his decisions would violate federal law, thereby necessitating the imposition of punitive damages.

148. As a direct and proximate result of Defendant's actions, Plaintiff suffered loss of income, emotional pain and suffering, embarrassment, and inconvenience. He is therefore entitled to general and special damages, economic damages including front and back pay, and reasonable attorneys' fees and costs (including expert witness costs) as permitted by law.

## SECOND CLAIM FOR RELIEF

**Defamation**

22

149.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

150.    An action for defamation requires "(1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication." *Williams v. District Court*, 866 P.2d 908, 911 n.4 (Colo. 1993).

151.    A statement is false "if its substance or gist is contrary to the true facts, and reasonable people learning of the statement would be likely to think significantly less favorably about the person referred to than they would if they knew the true facts." *Denver Publ'g. Co. v. Bueno*, 54 P.3d 893, 899 (Colo. 2002).

152.    On or about April 10, 2024, Defendant Sean Soon knowingly and willfully made false accusations about Plaintiff supposedly having engaged in theft, conversion, embezzlement, and other misconduct in a letter to the National Institute for Work and Learning.

153.    In or about the end of December 2024 or early January 2025, Plaintiff learned that Defendant Soon had repeated false allegations that Plaintiff had engaged in theft, conversion, embezzlement, and other misconduct related to his termination from CommunityWorks to at least one employee at the Colorado Department of Human Services – Employment First Division, Rebecca Balu.

154.    Upon information and belief, Defendant Sean Soon knowingly and willfully published to Ms. Balu false accusations that Plaintiff had engaged in theft, conversion, embezzlement, and other misconduct.

155.    Upon information and belief, Defendant Sean Soon, in his individual capacity and for his own personal benefit, knowingly and willfully published to third parties, false accusations that Plaintiff had engaged in theft, conversion, embezzlement, and other misconduct.

156.    Defendant made false accusations of theft, conversion, embezzlement, and other misconduct against Plaintiff with actual malice, knowing it to be false or with reckless disregard as to its truth or falsity.

157.    Plaintiff has suffered and continues to suffer irreversible damage to his reputation, character, and integrity within the statewide nonprofit community, thereby lowering him in the estimation of the community and deterring others from associating with him.

158.    As a direct and proximate result of Defendant's defamation, Plaintiff has sustained special damages, including irreparable impairment and damage to his reputation, lost employment opportunities, lost business opportunities, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses, as well as attorney's fees and costs.

## THIRD CLAIM FOR RELIEF

**Defamation Per Se**

159.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

160.    A statement is defamatory per se if it is "(1) on its face and without extrinsic proof, unmistakably recognized as injurious (defamatory meaning) and (2) specifically directed at the plaintiff (identity)." *Gordon v. Boyles*, 99 P.3d 75, 78-79 (Colo. App. 2004).

161.    Statements that "allege criminal activity" or "a matter incompatible with the individual's business, trade, profession, or office" are defamatory per se. *Id.* (citing *Bueno,* 54 P.3d at 899 n.9).

162.    Damages are presumed under a claim for defamation per se.

163.    In or about the end of December 2024 or early January 2025, Plaintiff learned that Defendant Soon knowingly and willfully published false accusations that Plaintiff had engaged in theft, conversion, embezzlement, and other misconduct to at least one employee at the Colorado Department of Human Services – Employment First Division, Rebecca Balu.

164.    Defendant acted with actual malice and/or reckless disregard for the truth or falsity of the allegations against Plaintiff, including allegations of criminal activity and/or a matter incompatible with Plaintiff's business, trade, profession, or office.

165.    As a direct and proximate result of Defendant's defamation per se, Plaintiff has sustained damages, including irreparable impairment and damage to his reputation, lost employment opportunities, lost business opportunities, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses, as well as attorney's fees and costs.

## FOURTH CLAIM FOR RELIEF

### Defamation

166.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

167.    In approximately November 2025, Plaintiff learned that Defendant Soon had repeated false allegations that Plaintiff had engaged in theft, conversion, embezzlement, and other misconduct, resulting in his termination from CommunityWorks, to additional employees of the National Institute for Work and Learning ("NIWL") beyond the original recipients of Soon's April 2024 letter.

168.    Upon information and belief, Defendant Sean Soon knowingly and willfully published these false accusations to employees of NIWL.

169.    Upon information and belief, Defendant Sean Soon, in his individual capacity and for his own personal benefit, knowingly and willfully published these false accusations to employees of NIWL.

170.    Defendant made false accusations of theft, conversion, embezzlement, and other misconduct against Plaintiff with actual malice, knowing it to be false or with reckless disregard as to its truth or falsity.

171.    Plaintiff has suffered and continues to suffer irreversible damage to his reputation, character, and integrity within the statewide nonprofit community, thereby lowering him in the estimation of the community and deterring others from associating with him.

172.    As a direct and proximate result of Defendant's defamation, Plaintiff has sustained special damages, including irreparable impairment and damage to his reputation, lost employment opportunities, lost business opportunities, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses, as well as attorney's fees and costs.

## FIFTH CLAIM FOR RELIEF

### Defamation Per Se

173.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

174.    In approximately November 2025, Plaintiff learned that Defendant Soon had repeated false allegations that Plaintiff had engaged in theft, conversion, embezzlement, and other misconduct, resulting in his termination from CommunityWorks, to additional employees of the National Institute for Work and Learning ("NIWL") beyond the original recipients of Soon's April 2024 letter.

175.    Defendant acted with actual malice and/or reckless disregard for the truth or falsity of the allegations against Plaintiff, including allegations of criminal activity and/or a matter incompatible with Plaintiff's business, trade, profession, or office.

176.    As a direct and proximate result of Defendant's defamation per se, Plaintiff has sustained damages, including irreparable impairment and damage to his reputation, lost employment opportunities, lost business opportunities, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses, as well as attorney's fees and costs.

## SIXTH CLAIM FOR RELIEF

### Defamation

177.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

178.    In approximately January 2025, Plaintiff learned that Soon had told Cedric Pride—Plaintiff's friend and a previous campaign supporter—that Plaintiff had been unfaithful to his wife and that it had contributed to the decision to terminate Plaintiff from CommunityWorks.

179.    Upon information and belief, Defendant Sean Soon knowingly and willfully published these false accusations to Pride.

180.    Upon information and belief, Defendant Sean Soon, in his individual capacity and for his own personal benefit, knowingly and willfully published these false accusations to Pride.

181.    Defendant made false accusations of infidelity and other misconduct against Plaintiff with actual malice, knowing it to be false or with reckless disregard as to its truth or falsity.

182.    Plaintiff has suffered and continues to suffer irreversible damage to his reputation, character, and integrity within the statewide nonprofit community, thereby lowering him in the estimation of the community and deterring others from associating with him.

183.    As a direct and proximate result of Defendant's defamation, Plaintiff has sustained special damages, including irreparable impairment and damage to his

reputation, lost employment opportunities, lost business opportunities, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses, as well as attorney's fees and costs.

## SEVENTH CLAIM FOR RELIEF

### Defamation Per Se

184.   Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

185.   In approximately January 2025, Plaintiff learned that Soon had told Cedric Pride that Plaintiff had been unfaithful to his wife and that it had contributed to the decision to terminate Plaintiff from CommunityWorks.

186.   A statement that a person is engaging in an extramarital affair "is an allegation of serious sexual misconduct" for the purpose of establishing a claim for defamation per se. *See Gordon*, 99 P.3d at 79.

187.   Defendant acted with actual malice and/or reckless disregard for the truth or falsity of the allegations against Plaintiff, including allegations of serious sexual misconduct and/or a matter incompatible with Plaintiff's business, trade, profession, or office.

188.   As a direct and proximate result of Defendant's defamation per se, Plaintiff has sustained damages, including irreparable impairment and damage to his reputation, lost employment opportunities, lost business opportunities, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses, as well as attorney's fees and costs.

## EIGHTH CLAIM FOR RELIEF

### Defamation

189.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

190.    In approximately January or February 2025, Plaintiff learned from Joshua Jackson that Soon had been falsely telling others in the Colorado legal and nonprofit community that Plaintiff had been "indicted" associated with Soon's false allegations that Plaintiff had engaged in theft, conversion, embezzlement, and other misconduct associated with his termination from CommunityWorks.

191.    Upon information and belief, Defendant Sean Soon knowingly and willfully published these false accusations to third parties in the Colorado legal and nonprofit community.

192.    Upon information and belief, Defendant Sean Soon, in his individual capacity and for his own personal benefit, knowingly and willfully published these false accusations to third parties in the Colorado legal and nonprofit community.

193.    Defendant made false accusations of theft, conversion, embezzlement, and other misconduct against Plaintiff with actual malice, knowing it to be false or with reckless disregard as to its truth or falsity.

194.    Plaintiff has suffered and continues to suffer irreversible damage to his reputation, character, and integrity within the statewide nonprofit community, thereby lowering him in the estimation of the community and deterring others from associating with him.

30

195.    As a direct and proximate result of Defendant's defamation, Plaintiff has sustained special damages, including irreparable impairment and damage to his reputation, lost employment opportunities, lost business opportunities, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses, as well as attorney's fees and costs.

## NINTH CLAIM FOR RELIEF

### Defamation Per Se

196.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

197.    In approximately January or February 2025, Plaintiff learned from Joshua Jackson that Soon had been falsely telling others in the Colorado legal and nonprofit community that Plaintiff had been "indicted" associated with Soon's false allegations that Plaintiff had engaged in theft, conversion, embezzlement, and other misconduct associated with his termination from CommunityWorks.

198.    Defendant acted with actual malice and/or reckless disregard for the truth or falsity of the allegations against Plaintiff, including allegations of criminal activity and/or a matter incompatible with Plaintiff's business, trade, profession, or office.

199.    As a direct and proximate result of Defendant's defamation per se, Plaintiff has sustained damages, including irreparable impairment and damage to his reputation, lost employment opportunities, lost business opportunities, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses, as well as attorney's fees and costs.

31

## TENTH CLAIM FOR RELIEF

### Defamation

200. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

201. In approximately January or February 2025, Plaintiff learned that Soon had told Kimbro that he had placed a lien on Plaintiff's house associated with Soon's allegations that Plaintiff had engaged in theft, conversion, and/or embezzlement from CommunityWorks. No such lien has been placed on Plaintiff's home.

202. Upon information and belief, Defendant Sean Soon knowingly and willfully published these false accusations to Kimbro and others.

203. Upon information and belief, Defendant Sean Soon, in his individual capacity and for his own personal benefit, knowingly and willfully published these false accusations to Kimbro and others.

204. Defendant made false accusations of theft, conversion, embezzlement, and other misconduct against Plaintiff with actual malice, knowing it to be false or with reckless disregard as to its truth or falsity.

205. Plaintiff has suffered and continues to suffer irreversible damage to his reputation, character, and integrity within the statewide nonprofit community, thereby lowering him in the estimation of the community and deterring others from associating with him.

206. As a direct and proximate result of Defendant's defamation, Plaintiff has sustained special damages, including irreparable impairment and damage to his

32

reputation, lost employment opportunities, lost business opportunities, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses, as well as attorney's fees and costs.

## ELEVENTH CLAIM FOR RELIEF

### Defamation Per Se

207.   Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

208.   In approximately January or February 2025, Plaintiff learned that Soon had told Kimbro that he had placed a lien on Plaintiff's house associated with Soon's untrue allegations that Plaintiff had engaged in theft, conversion, and/or embezzlement from CommunityWorks. No such lien has been placed on Plaintiff's home.

209.   Defendant acted with actual malice and/or reckless disregard for the truth or falsity of the allegations against Plaintiff, including allegations of criminal activity and/or a matter incompatible with Plaintiff's business, trade, profession, or office.

210.   As a direct and proximate result of Defendant's defamation per se, Plaintiff has sustained damages, including irreparable impairment and damage to his reputation, lost employment opportunities, lost business opportunities, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses, as well as attorney's fees and costs.

## TWELFTH CLAIM FOR RELIEF

### Defamation

211.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

212.    On or about December 15, 2025, Plaintiff learned that while CommunityWorks was still in operation, Soon repeatedly claimed to Asya Stiles, CommunityWorks' Chief of Staff, that Plaintiff had supposedly only hired Mobley in order to have Mobley's assistance in "lining [Plaintiff's] pockets" by stealing from CommunityWorks so that Plaintiff could run for Aurora City Council.

213.    Upon information and belief, Defendant Sean Soon, in his individual capacity and for his own personal benefit, knowingly and willfully published these false accusations to Stiles and others.

214.    Defendant made false accusations of theft, conversion, embezzlement, and other misconduct against Plaintiff with actual malice, knowing it to be false or with reckless disregard as to its truth or falsity.

215.    Plaintiff has suffered and continues to suffer irreversible damage to his reputation, character, and integrity within the statewide nonprofit community, thereby lowering him in the estimation of the community and deterring others from associating with him.

216.    As a direct and proximate result of Defendant's defamation, Plaintiff has sustained special damages, including irreparable impairment and damage to his reputation, lost employment opportunities, lost business opportunities, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses, as well as attorney's fees and costs.

34

## THIRTEENTH CLAIM FOR RELIEF

### Defamation Per Se

217.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

218.    On or about December 15, 2025, Plaintiff learned that while CommunityWorks was still in operation, Soon repeatedly claimed to Asya Stiles, CommunityWorks' Chief of Staff, that Plaintiff had supposedly only hired Mobley in order to have Mobley's assistance in "lining [Plaintiff's] pockets" by stealing from CommunityWorks so that Plaintiff could run for Aurora City Council.

219.    Defendant acted with actual malice and/or reckless disregard for the truth or falsity of the allegations against Plaintiff, including allegations of criminal activity and/or a matter incompatible with Plaintiff's business, trade, profession, or office.

220.    As a direct and proximate result of Defendant's defamation per se, Plaintiff has sustained damages, including irreparable impairment and damage to his reputation, lost employment opportunities, lost business opportunities, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses, as well as attorney's fees and costs.

## FOURTEENTH CLAIM FOR RELIEF

### Tortious Interference with a Contract

221.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

222.    Plaintiff had a contract for employment with CommunityWorks.

35

223.    Defendant knew or should have known of Plaintiff's contractual employment relationship with CommunityWorks.

224.    Defendant willfully and wantonly, and for personal reasons, by words and/or conduct, intentionally interfered with CommunityWorks' performance of the contract, thereby causing CommunityWorks to breach its contract for employment with Plaintiff by wrongfully discharging Plaintiff based on Defendant's fabricated and racially discriminatory allegations that Plaintiff engaged in theft, conversion, embezzlement, and/or other misconduct during his employment with CommunityWorks.

225.    Defendant's interference was intentional, improper, and unlawful.

226.    As a direct and proximate result of Defendant's intentional, improper, and tortious interference with Plaintiff's contract for employment, Plaintiff suffered, and continues to suffer, injury including, but not limited to, severe emotional distress, mental anguish, pain and physical suffering, and psychological damage, and other nonpecuniary damages. Plaintiff also suffered pecuniary losses including, but not limited to, lost wages, lost benefits, attorney's fees and costs, diminished opportunities for career advancement, and damage to reputation.

### FIFTEENTH CLAIM FOR RELIEF

### Tortious Interference with Prospective Business Relations

227.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

228.    Plaintiff had a business relationship with various nonprofits and governmental organizations in Colorado, including, inter alia, the National Institute for

Work and Learning and the Colorado Department of Human Services – Employment First Division, as well as other third party grantors and nonprofit funding organizations.

229.   Before Defendant's actions, Plaintiff also had other potential and existing business relationships with other third parties.

230.   Defendant knew of those business relationships.

231.   Defendant intentionally and improperly interfered with Plaintiff's business relationships.

232.   Defendant's actions induced or otherwise caused third parties not to enter into or continue the prospective relations with Plaintiff and/or prevented Plaintiff from acquiring or continuing his prospective relations with those third parties.

233.   Defendant's interference was intentional, improper, and unlawful.

234.   As a direct and proximate result of Defendant's intentional, improper, and tortious interference with Plaintiff's contract for employment, Plaintiff suffered, and continues to suffer, injury including, but not limited to, severe emotional distress, mental anguish, pain and physical suffering, and psychological damage, and other nonpecuniary damages. Plaintiff also suffered pecuniary losses including, but not limited to, lost wages, lost benefits, attorney's fees and costs, diminished opportunities for career advancement, and damage to reputation.

### SIXTEENTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

235.   Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

236. By making false allegations against Plaintiff concerning his professional career, criminal conduct, and serious sexual misconduct that Defendant knew or should have known to be false and without merit, Defendant engaged in extreme and outrageous conduct.

237. Defendant made the false allegations concerning Plaintiff with the intent of causing Plaintiff severe emotional distress.

238. Defendant's wrongful and outrageous conduct has caused Plaintiff to experience severe emotional distress, including but limited to post-traumatic stress disorder, anxiety, and worry stemming from the threat of not being able to work in the Colorado nonprofit community, loss of reputation, loss of employability, and loss of employment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor against Defendant and order the following relief as allowed by law:

A. Award Plaintiff's economic damages as established at trial, including damages fully and fairly compensating Plaintiff for the reputational harm and lost business opportunities as set forth herein;

B. Award Plaintiff's compensatory damages including, but not limited to, those for past and future pecuniary and non-pecuniary losses, garden-variety emotional distress, pain, inconvenience, mental anguish, and loss of enjoyment of life, and other non-pecuniary losses;

C. Award Plaintiff punitive damages under his First Claim for Relief;

D.     Award Plaintiff's attorneys' fees and costs incurred;

E.     Award Plaintiff pre-judgment and post-judgment interest at the highest lawful rate; and

F.     Such further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Dated this 16th day of December, 2025.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: *s/ Abby Zinman*
    Shelby Woods
    Abby Zinman
    HKM Employment Attorneys LLP
    518 17th Street, Suite 1100
    Denver, Colorado 80202
    Telephone: (720) 668-8989
    swoods@hkm.com
    azinman@hkm.com
    *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this December 16, 2025, a true and correct copy of the foregoing **SECOND AMENDED COMPLAINT AND JURY DEMAND** was filed via CM/ECF on the following:

Anna Reinert
Brittney Bulawa
555 Seventeenth Street, Suite 3400
Denver, CO 80202
Telephone: 303-200-6882
areinert@grsm.com
bbulawa@grsm.com
*Attorneys for Defendant*

/s/ Alyssa Colwell
Alyssa Colwell, Paralegal